IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRIAN HARGRAVE,              )
                             )
            Plaintiff,       )
                             )
      v.                     )        1:19CV838
                             )
DAIMLER TRUCKS NORTH AMERICA, )
                             )
            Defendant.       )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Presently before the court is Defendant Daimler Trucks North America's ("Defendant" or "DTNA") Motion for Summary Judgment. (Doc. 19.) DTNA filed a brief in support of its Motion, (Doc. 20); pro se Plaintiff Brian Hargrave ("Plaintiff") filed a response, (Doc. 31), and DTNA filed a reply, (Doc. 32). For the reasons stated herein, this court will grant Defendant's Motion for Summary Judgment.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

   **A.    Factual Background**

Plaintiff Brian Hargrave, proceeding pro se, worked for DTNA from December 3, 2018 through April 24, 2019. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Br.") (Doc. 20) at 2.) Plaintiff started off his employment with DTNA in the welding department. (Id. at 3.) As of February 2019, Plaintiff's

performance was considered "on target" in the welding department. (Doc. 31-1 at 2.)[1] However, by the following month, Plaintiff's job performance was called into question. On March 15, 2019, the supervisor of the welding department, Rick Land, wrote that Plaintiff "still has a long way to go" and he "really needs to show more improvement" in his job performance. (Def.'s Br, Ex. 1, Declaration of Desiree Mudd ("Mudd Decl.") (Doc. 20-1) at 9.) As of March 28, 2019, the welding management team determined Plaintiff "wasn't successful." (Id. at 7.) This led to Plaintiff's transfer to the assembly department. (Id.)

Shortly after Plaintiff's transfer to assembly, issues with co-workers were called to the attention of DTNA. On April 12, 2019, Plaintiff's co-worker Crystal Brown ("Brown") reported to Human Resources ("HR") that Plaintiff told her she had "it made . . . because she is a white woman." (Id. at 11.) Investigations of HR complaints are performed by Ms. Desiree Mudd, ("Mudd"), DTNA's Labor Relations Specialist. (Id. ¶ 1.) Mudd herself is African American. (Id. ¶ 4.) On April 12, in response to Brown's complaint, Mudd instructed Plaintiff that his comment was "not an acceptable way to speak to his co-workers" and "a violation

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

of the company's Anti-Harassment policy." (<u>Id.</u> at 11.) DTNA's anti-harassment policy is listed among its "Core Human Resources Policies." (<u>Id.</u> at 5.) It states that "[a]ny harassment . . . is strictly prohibited," and "[e]mployees who engage in harassment will be disciplined, up to and including discharge[.]" (<u>Id.</u>)

Six days after Brown's complaint, on April 18, 2019, another one of Plaintiff's co-workers – Gary Allison ("Allison") – submitted a new HR complaint about Plaintiff "for being aggressive and threatening, harassing him and using foul language" during Plaintiff's training. (<u>Id.</u> at 11.) According to Allison, Plaintiff cursed at Allison and another co-worker, Tray Gillespie. (<u>Id.</u> at 21.) Allison said that when he offered to show Plaintiff how to finish an assembly task, Plaintiff threatened to "beat [his] ass" and, with "a wrench in his hand," started "moving toward" Allison. (<u>Id.</u>)

Upon receiving Allison's complaint, Mudd called Plaintiff in for an interview. Plaintiff then expressed to Mudd that Allison had previously called him a racial slur, which led to the altercation. (<u>Id.</u> at 12.) Plaintiff acknowledged that a dispute had occurred but insisted "he never said" the things Allison claimed and that Allison "threatened to beat him up." (<u>Id.</u> at 11.) Mudd informed Plaintiff that he would be

- 3 -

temporarily suspended from work while she further investigated the incident. (Id. ¶ 10.)

Mudd then confirmed Allison's account of the incident with "several" employees, who "stated [Plaintiff] threatened to beat [Allison's] ass." (Id. at 12.) Mudd also interviewed two other employees who worked with Plaintiff in the past – these employees described him as "abusive" and "threatening and intimidating." (Id. at 13.) Mudd spoke with one individual who Plaintiff claimed witnessed Allison's use of the racial slur – according to Mudd's report, this individual "did not witness [Allison] saying [the slur] to [Plaintiff]." (Id. at 13.)

At the end of her investigation, Mudd ultimately "concluded Plaintiff had engaged in a violation of DTNA's anti-harassment policy and decided to terminate his employment." (Id. ¶ 11.) Mudd's full report on Plaintiff details a variety of concerns about his demeanor, stating "that if Brian Hargrave's employment continued[,] this harassing, threatening and intimidating behavior. . . would continue" as well. (Id. at 12.) Plaintiff was subsequently terminated.

In Plaintiff's complaint, (Compl. (Doc. 2)), he asserts race discrimination under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. 2000(e). (Id. at 3-4.) Specifically, Plaintiff alleges he was terminated based on

- 4 -

racial discrimination. In his complaint, he describes the incident on April 16, 2019, in which "a white employee" – Allison – called him a racial slur. (Id. at 4.) Plaintiff argues that he was terminated on the basis of this "verbal altercation" while no action was taken against Allison, who is white.

### B.   <u>Procedural Background</u>

Plaintiff submitted a charge of discrimination to the Equal Employment Opportunity Commission ("EEOC"), (Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), Ex. 2, Charge of Discrimination ("EEOC Charge") (Doc. 32-2)), on May 22, 2019. The charge alleged racial discrimination and retaliation: Plaintiff described "a White coworker" using a racial slur as the basis of his charge, claiming he was terminated two weeks later and "was never given a reason as to why." (Id.) Plaintiff's charge alleges the discrimination took place between April 8, 2019, and April 10, 2019. (Id.)

Plaintiff filed a Complaint, (Doc. 2), with the court on August 15, 2019. Defendant filed a Motion for Summary Judgment on May 28, 2020. (Doc. 19.) Plaintiff filed his response on August 31, 2020. (Doc. 31.) Defendant filed a reply on September 14, 2020. (Doc. 32). This case is ripe for adjudication.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247-48). "Mere allegations" in support of a party's pleadings without "any significant probative evidence" to support those allegations do not provide sufficient evidence to allow a reasonable jury to resolve a dispute in favor of that party. Liberty Lobby, 477 U.S. at 249;

- 6 -

see also <u>Brown v. Sears Auto. Ctr.</u>, 222 F. Supp. 2d 757, 761 (2002 M.D.N.C.) ("[T]he non-moving party cannot rely solely on unsupported assertions to demonstrate that a genuine issue of material fact exists.").

Put another way, simply showing some "metaphysical doubt as to the material facts" is not sufficient to establish a genuine dispute. <u>Matsushita</u>, 475 U.S. at 586–87. In considering whether a genuine issue of material fact exists, the court must be careful not to weigh the evidence or make credibility determinations. <u>Liberty Lobby</u>, 477 U.S. at 250. Instead, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of that party. <u>Id.</u> at 255.

Moreover, Plaintiff is proceeding pro se, which rises additional considerations for the court. When reviewing a pro se complaint, federal courts should examine carefully the plaintiff's factual allegations and not summarily dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978) (internal quotation marks omitted); <u>see also Boag v. MacDougall</u>, 454 U.S. 364, 365 (1982)

- 7 -

(federal courts should construe a pro se petitioner's pleading liberally).

### III. **ANALYSIS**

#### A. **Evidence of Discrimination under Title VII**

There are two ways that Plaintiff can defeat a motion for summary judgment in a Title VII discriminatory termination case. The first is through direct evidence of discrimination: "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). In the present case, Plaintiff does not allege any statement by Mudd or other decisionmakers indicating that Plaintiff's race played a direct role in his termination.

Instead, Plaintiff pursues the second path to defeating a motion for summary judgment: the framework from McDonnell Douglas v. Green, 411 U.S. 792 (1973). McDonnell Douglas test requires Plaintiff to demonstrate four elements to prove a prima facie case of racial discrimination: (1) that he is a member of a protected class; (2) he suffered an adverse employment action; (3) that Plaintiff was performing well enough to meet the

- 8 -

legitimate expectations of his employer; and (4) the adverse employment action gives rise to an inference of unlawful discrimination. McKiver v. Gen. Elec. Co., 11 F. Supp. 2d 755, 758 (M.D.N.C. 1997). Here, the first element is satisfied: it is undisputed that Plaintiff is African-American and therefore a member of a protected class.

As to the second element of the prima facie case, Plaintiff alleged in his complaint, (Compl. (Doc. 2) at 4), and his EEOC Charge, (Doc. 32-2), that the relevant adverse employment action was his termination. This is an adverse action for the purposes of a prima facie case; see, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); and DTNA does not contest that Plaintiff was terminated. (Def.'s Br. (Doc. 20) at 2.)

However, in his response, Plaintiff also raises his transfer from welding to assembly as another possible adverse employment action. (Pl.'s Mem. of Law in Opp'n of Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 31) at 9.) This was not raised in Plaintiff's EEOC Charge; in fact, Plaintiff listed only the specific dates of the incident with Allison in his EEOC Charge. (EEOC Charge (Doc. 32-2).) Those April 2019 dates were after Plaintiff's transfer, which occurred around March 28, 2019. (Def.'s Br. (Doc. 20) at 4.) Plaintiff even mentioned his

- 9 -

transfer in the charge without so much as implying it was racially motivated. (EEOC Charge (Doc. 32-2).) Plaintiff cannot now raise his transfer, which occurred at an earlier date and was effectuated by different individuals, as an adverse action that is "reasonably related" to his EEOC Charge. Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). Plaintiff's EEOC Charge gave no reasonable indication to DTNA that it ought to investigate the circumstances surrounding Plaintiff's transfer. See id. at 512 ("A Title VII plaintiff can of course exhaust administrative remedies if a reasonable investigation of his administrative charge would have uncovered the factual allegations set forth in formal litigation.").[2] Thus, Plaintiff has not exhausted his administrative remedies with regard to this aspect of his argument, and this court will consider only his termination as the relevant adverse action at this time.

Though Plaintiff's termination fulfills the second element of a prima facie case, Plaintiff has not alleged facts demonstrating an issue for trial with regards to the third

---

[2] Plaintiff observes that when he "was moved back to assembly [the Welding Department] it returned to an all white department." (Pl.'s Resp. (Doc. 31) at 3.) However, in spite of this observation, Plaintiff's only allegation of racial discrimination or harassment was the subsequent incident with Allison. Thus, even setting exhaustion aside, Plaintiff has not provided any facts to allege that his transfer was the result of any illegitimate discrimination.

- 10 -

element: adequate job performance. Plaintiff disputes that his job performance was subpar, citing "progress reviews" during his time in welding that stated he was "on target." (Pl.'s Resp. (Doc. 31) at 2.) However, these progress reviews were in February of 2019, (Doc. 31-1 at 2), well before the emails criticizing his later performance, (Mudd Decl. (Doc. 20-1) at 7). Evidence presented by DTNA contradicts Plaintiff's claim that he was performing well; Plaintiff was transferred out of the welding department because he failed to perform adequately, according to supervisor emails. (Id.)

Nevertheless, Plaintiff was not terminated on the basis of his job performance – even DTNA's stated reason for termination was Plaintiff's violation of company anti-harassment policies. In cases where a plaintiff acknowledges he violated company policy, but bases his claim on the allegation he was disciplined more harshly than a similar employee outside his protected class, the "adequate job performance" element of the prima facie case may give way to a comparison of discipline of those outside the protected class. See, e.g., Curry v. Menard, Inc., 270 F.3d 473, 478 (7th Cir. 2001); Hazel v. Med. Action Indus., Inc., 216 F. Supp. 2d 541, 546 (W.D.N.C. 2002) ("A disparate-treatment claim in the context of employee discipline is typically based upon some aspect of job performance which was less than

- 11 -

satisfactory, but which resulted in less severe treatment for the non-minority."). Plaintiff compares himself to Allison and indicates his claim is based on their disparate discipline following the wrench incident. (Compl. (Doc. 2) at 3.)

Under this understanding of Plaintiff's claim, he can meet the final element of his prima facie case by demonstrating that "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004). Plaintiff has identified that he was terminated, whereas Allison was not, following the incident. See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (when alleging discriminatory discipline, a plaintiff must show "that the disciplinary measures enforced against him were more severe than those enforced against those other employees"). Defendant rightly disputes whether Allison was similarly situated to Plaintiff, as Mudd determined that Plaintiff was the aggressor and escalated the encounter to physical violence. (Mudd Decl. (Doc. 20-1) at 12-13.)

In order to construe pro se Plaintiff's allegations liberally, and avoid weighing of credibility and the facts, this court will continue its analysis under the assumption that Plaintiff has presented a prima facie case giving rise to an inference of discrimination. Regardless of this assumption,

- 12 -

however, Defendant has clearly established legitimate reasons for terminating Plaintiff and prevails under the burden-shifting framework of McDonnell Douglas.

### B. Defendant's Reason for Termination

Under the McDonnell Douglas framework, once Plaintiff has established a prima facie case, the burden shifts to Defendant "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)). DTNA has successfully met this burden by providing a legitimate and nondiscriminatory reason for its termination of Plaintiff.

In fact, DTNA has provided a litany of legitimate reasons for Plaintiff's termination that are unrelated to racial discrimination: Plaintiff was in violation of DTNA's anti-harassment policy in multiple ways. Mudd found that Plaintiff posed a physical threat to Allison by coming after Allison with a "tool in his hands," regardless of any earlier verbal provocation. (Mudd Decl. (Doc. 20-1) at 12.) Mudd heard from Plaintiff's other co-workers that he was abusive, intimidating, and threatening. (Id. at 13.) Plaintiff has not presented any facts showing there is a genuine issue of fact for trial.

- 13 -

Moreover, Allison is not an appropriate comparator to Plaintiff: Mudd's interviews indicated that Plaintiff was the aggressor and was the only one wielding a wrench. (Id. at 12.) Though Plaintiff claims that "Allison was the aggressor," (Pl.'s Resp. (Doc. 31) at 11), DTNA's investigator came to a different conclusion based on the accounts of multiple witnesses. (Mudd Decl. (Doc. 20-1) at 12.) Regardless of whether Mudd's understanding of the incident was correct, this reasoned conclusion was the basis of Plaintiff's termination.[3]

In similar situations, Mudd has terminated employees who made violent threats or used abusive language: disciplinary records indicate that employees who have threatened physical

---

[3] Plaintiff argues that the statements received by Mudd would not be admissible at trial and this court should not consider them at this stage. (Pl.'s Resp. (Doc. 31) at 5, 15.) It is true that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991). However, the relevant statements would be admissible to demonstrate their effect on Mudd and her termination decision, rather than for the truth of the matter asserted. The Fourth Circuit has made clear that "[w]here, as here, 'third-party statements . . . are offered not for the truth of the matters asserted therein, but as an explanation of why [the employer] believed that terminating the plaintiff's employment . . . was necessary and appropriate,' evidentiary rules governing the consideration of hearsay are not implicated." Arrington v. E.R. Williams, Inc., 490 F. App'x 540, 543 (4th Cir. 2012) (quoting Royall v. Nat'l Ass'n of Letter Carriers, 507 F. Supp. 2d 93, 98 n.10 (D.D.C. 2007)).

violence, and even some who merely came close to doing so, were often terminated. (Id. at 32-35.) Plaintiff contests that the list does not provide the fired employees' exact names, genders, or "numbers"; however, Plaintiff provides no reason that these facts would be necessary or even relevant to determining whether his own termination was in line with prior practice. (Pl.'s Resp. (Doc. 31) at 11.) Moreover, Plaintiff was already the subject of harassment-related discipline only six days prior to the incident at issue. (Mudd Decl. (Doc. 20-1) at 11.)

Effectuating DTNA's anti-harassment policy was the claimed basis of Plaintiff's termination, and regardless of its wisdom or accuracy, Mudd's decision was plainly nondiscriminatory given her understanding of the incident. Mudd's decision was an "honest and reasonable conclusion" that was "supported by the statements of multiple employees." (Def.'s Br. (Doc. 20) at 14.) The legitimacy and nondiscriminatory nature of the termination decision is only compounded by the fact that Mudd herself is a member of the same protected class as Plaintiff. See, e.g., Demesme v. Montgomery Cnty. Gov't, 63 F. Supp. 2d 678, 683 (D. Md. 1999), aff'd, 208 F.3d 208 (4th Cir. 2000) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation."); Coggins v. Gov't of D.C., No. 97-2263, 1999 WL 94655, at *4 (4th Cir. 1999) ("The fact that both

- 15 -

Krull and Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely.").

### C. <u>DTNA's Stated Reason for Termination is Not Pretextual</u>

Since DTNA has provided a legitimate explanation for Plaintiff's termination, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that Defendant's articulated reason is mere pretext. <u>McKiver</u>, 11 F. Supp. 2d at 758. "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." <u>Merritt v. Old Dominion Freight Line, Inc.</u>, 601 F.3d 289, 294 (4th Cir. 2010) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981). Plaintiff provides no evidence beyond conclusory allegations that Mudd's reasoning was pretextual. Plaintiff alleges that Mudd may have "coerced or simply added" language incriminating him to the statements supplied by co-workers. (Pl.'s Resp. (Doc. 31) at 5.) However, Plaintiff provides no evidence to support this claim beyond pure speculation. Nor does Plaintiff provide any evidence that Mudd specifically harbored racial animus against him.

Plaintiff also argues that DTNA gave "two different reasons" for his termination, which he claims demonstrates Defendant's reasoning was pretextual. (<u>Id.</u> at 20.) Plaintiff

- 16 -

makes this argument by pointing to DTNA's position statement to the EEOC, which cites both DTNA's anti-discrimination and DTNA's anti-harassment policy as reasons for Plaintiff's termination. (Doc. 31-1 at 10, 13, 14, 15.) However, DTNA's statement maintains throughout that Plaintiff "threatened physical violence with a wrench in his hand . . . [and] was terminated as of April 24, 2019, for violation of DTNA's anti-harassment policy." (Id. at 14.) This is consistent with Defendant's position before this court and does not indicate DTNA's reasoning was pretextual.

DTNA has provided a legitimate reason for Plaintiff's termination that Plaintiff cannot dismiss as pretextual. Summary judgment is appropriate here because "the non-moving party cannot rely solely on unsupported assertions to demonstrate that a genuine issue of material fact exists." Brown, 222 F. Supp. 2d at 761.

### D.   Hostile Work Environment Claim

Plaintiff also argues that Allison's behavior "wasn't welcome" and was "offensive [and] hostile," invoking an additional hostile work environment claim. (Pl.'s Resp. (Doc. 31) at 17.) To overcome a motion for summary judgment on this claim, Plaintiff must demonstrate that he was the victim of unwelcome, race-based harassment that was "sufficiently severe

- 17 -

or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citation omitted). Plaintiff must also show that this harassment can be imputed to Defendant. Bazemore v. Best Buy, 957 F.3d 195, 200 (4th Cir. 2020). The first two elements are clearly met, as Allison's comment was both unwelcome and patently race-based.

Plaintiff only alleges this single instance of racial harassment. A single instance of harassment can, in extreme circumstances, be sufficiently severe to establish a hostile work environment. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015). Allison's use of a racial slur could be deemed extreme; the Fourth Circuit has held that Allison's chosen epithet has the power to "quickly alter the conditions of employment and create an abusive working environment." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)). However, the question of severity is moot, as Plaintiff is not able to satisfy the final element of imputability on the facts presented. See Bazemore, 957 F.3d at 202-03 (choosing not to address whether severe and pervasive harassment has been alleged because plaintiff was

unable to demonstrate the conduct was imputable to the defendant).

In this instance, the slur was used by a co-worker, not a supervisor. Plaintiff does not allege he perceived Allison to have any control over his job. The Supreme Court has held that "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). Plaintiff does not allege any negligence on the part of DTNA in regulating the work environment, nor did he take advantage of the complaint hierarchy in place. (Mudd Decl. (Doc. 20-1) at 12.) Moreover, any plaintiff who wants to "impute liability to [his] employer for harassment by a co-worker may not be able to establish the employer's negligence if []he did not report the harassment." Boyer-Liberto, 786 F.3d at 278. Plaintiff did not complain to Mudd, (Mudd Decl. (Doc. 20-1) at 12), nor did he complain to his supervisor, (Pl.'s Resp. (Doc. 31) at 18). He asked his "lead man" to inform their supervisor but does not dispute that DTNA management only received notice about the comment when Plaintiff was brought in to discuss Allison's HR complaint. (Id.) For these reasons, even if the slur were sufficiently extreme for a jury to find it created a hostile work environment, no reasonable jury could impute

Allison's alleged comment to DTNA. Thus, this court will grant Defendant's motion with regard to Plaintiff's hostile work environment claim as well.

### E. Plaintiff's Union Claim

Finally, Plaintiff also attempts to bring a new claim against his union in this action. Plaintiff argues in his response brief that his union "fail[ed] to grieve the Plaintiff's suspension or termination without giving a reason why," and claims this is "arbitrary and discriminatory." (Pl.'s Resp. (Doc. 31) at 10.) As Defendant DTNA has noted, this action is not the proper avenue for such a claim. If Plaintiff wishes to bring a claim against his union, he should do so, rather than raise that argument in this action against his former employer.

## IV. CONCLUSION

For the reasons set forth above, this court finds that Defendant Daimler Trucks North America's Motion for Summary Judgment will be granted.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 19), is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**.

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

- 20 -

This the 17th day of December, 2020.

_____
United States District Judge